**NORTON COMPANY, Appellant-Cross Appellee,**

v.

**CARBORUNDUM COMPANY,**
**Appellee-Cross Appellant.**

**Nos. 75–1309, 75–1310.**

United States Court of Appeals, First Circuit.

Argued Nov. 4, 1975.

Decided Feb. 3, 1976.

As Amended Feb. 23, 1976.

Allen Kirkpatrick, Washington, D. C., with whom Kevin E. Joyce, Cushman, Darby & Cushman, Washington, D. C., Joseph L. Cotter, and Goodwin, Procter & Hoar, Boston, Mass., were on brief, for Norton Co.

William H. Webb, Pittsburgh, Pa., with whom John M. Webb, Pittsburgh, Pa., John M. Hall, Boston, Mass., Webb, Burden, Robinson & Webb, P.A., Pittsburgh, Pa., and Choate, Hall & Stewart, Boston, Mass., were on brief, for Carborundum Co.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

This is a patent infringement action brought by Norton Company ("Norton"), appellant and cross-appellee, against Carborundum Company ("Carborundum"), appellee and cross-appellant.[1] Both parties are large manufacturers of industrial abrasives, and this litigation involves several of their product lines. At issue is patent No. 3,181,939 ("the '939 patent"),[2] which deals with fused alumina/high-zirconia abrasives.[3]

The applicant indicated in the original patent application that the following was one of the objects of the invention for which the '939 patent was sought: "to provide an abrasive of high strength and hardness . . . having a high de-

---

1. Carborundum counterclaimed against Norton charging it with antitrust violations by reason of its seeking to enforce the patent at issue against Carborundum's bauxite mix product. Each party is appealing those aspects of the district court's opinion which are adverse to it. Technically, under Fed.R.App.P. 28(h), Norton is considered to be the appellant and Carborundum the appellee; for the sake of clarity, however, we shall refer to each party by name throughout this opinion.

2. The patent was applied for on January 27, 1961, and, after a lengthy prosecution, was issued on May 5, 1965, to Marshall and Roschuk, two employees of Norton, the assignee;

it is entitled, "Fused Alumina-Zirconia Abrasives."

3. All of the patents and products involved in this case may be classified under the general rubric of abrasive materials. The primary uses of abrasive materials of the kind involved in this case are in grinding wheels ("bonded abrasives") and in sandpaper ("coated abrasives").

The technical aspects of the case, many of which are undisputed by the parties, are summarized with admirable clarity and conciseness in the published opinion of the district court. *Norton Co. v. Carborundum Co.,* 397 F.Supp. 639 (D.Mass.1975).

gree of durability . . . [and having] high impact strength suitable for use in snagging operations."[4] By fusing alumina (specifically "alpha-alumina") and zirconia the inventors wished to produce a product combining the strength and hardness of alumina with the durability of zirconia.[5] The district court passed on, *inter alia*, the validity and the scope of the '939 patent and whether it was infringed by Carborundum's product called "Big Red" or "BR".[6] The conclusions of the district court are well summarized in its "Substitute Interlocutory Judgment and Final Judgment"[7] (hereinafter "Final Judgment"), entered on July 15, 1975:

"1. Patent No. 3,181,939, Fused Alumina-Zirconia Abrasives, Marshall and Roschuk, now ascribed to Marshall, Roschuk and Thibault, May 4, 1965, is to be read as limited to products originating from a raw mix consisting essentially of alumina and zirconia, and not to include a raw mix containing bauxite [a mined material that converts largely into alumina, with some small portions of other minerals].

2. As so read the patent is valid and enforcible.

3. Carborundum's BR sandpaper, so-called, but none other of its accused products infringes the patent.

4. The counterclaim asserting violations of 15 U.S.C. §§ 2 and 15 is dismissed.

5. Damages for infringement, and the allocation of costs, are reserved.[8]

[1] Our review of the district court's several findings · of fact is, of course, governed by the "clearly erroneous" standard of Fed.R.Civ.P. 52(a). "[I]f the district court's findings, considering the record as a whole, whether based on live or other types of evidence are reasonably supported, they must stand." *Custom Paper Products Co. v. Atlantic Paper Box Co.*, 469 F.2d 178, 179 (1st Cir. 1972). *See also Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.*, 336 U.S. 271, 274–75, 69 S.Ct. 535, 93 L.Ed. 672 (1949); *Texas Co. v. R. O'Brien & Co.*, 242 F.2d 526, 529 (1st Cir. 1957).

The first three of the conclusions contained in the Final Judgment of the district court are appropriately considered together, since the issue of infringement can be dealt with only after the patent's scope, validity and enforceability have been determined. These first three conclusions are based on two essential holdings of the district court, which are themselves bottomed on numerous findings of fact. We may summarize the two crucial holdings as follows:

(a) The '939 patent does not cover the product of a raw mix containing bauxite because the claim when read in the light of the specifications and the file wrapper fails to include a product so produced. Therefore, only a narrow reading of the patent (viz. as including the product of an alumina mix, but not the product of a bauxite mix) is justified. (Hereinafter we refer to this as the *scope* issue.)[9]

---

4. Norton's Application for Patent (January 24, 1961).

"Snagging" is the removal by grinding of projections from freshly cast stainless steel or similar products.

5. The district court found the invention covered by the '939 patent to be principally the product's high zirconia content. 397 F.Supp. at 641.

6. This is a coated abrasive product which originates from an alumina mix.

7. On June 18, 1975, the district court filed an interlocutory judgment and an opinion. The interlocutory judgment was revised by the court on June 27. Pursuant to Norton's motion, the court, on July 15, filed a supplemen-

tal opinion and a "Substitute Interlocutory Judgment and Final Judgment." *See* 397 F.Supp. 639.

8. 397 F.Supp. at 649.

9. The practical consequences of this narrow reading of the patent are considerable. Various Carborundum products (specifically those denominated in the record as R–51, R–71 and R–81) cannot be said to infringe the '939 patent if the narrow reading is the correct one, since they are products of a raw mix containing bauxite.

On the other hand, Carborundum's Big Red, the product of an alumina mix rather than a bauxite mix, could be found to infringe the '939 patent even as narrowed.

(b) If, as it argues, Norton's patent application should be read as including the product of a bauxite mix, then Norton is guilty of misconduct for its failure to cite patent No. 1,240,491 ("the '491 patent"). Because of this misconduct, the '939 patent would be unenforceable if read broadly so as to include a bauxite mix. (Hereinafter we refer to this as the *enforceability* issue.)

■ We have carefully studied the record and the briefs and heard oral arguments of both parties, and we have given appropriate weight to the meticulous and well-reasoned opinion of the district court. We affirm its determination that the scope of the '939 patent should be narrow and the consequences of that determination, notably the holding that Carborundum's Big Red infringes. Since we agree with the district court that the '939 patent must be read narrowly, we find it unnecessary to pass on the contingent[10] holding of the district court that Norton's disabling misconduct would render the '939 patent unenforceable if broadly construed.[11] (We shall, however, inquire as to whether the enforceability of the '939 patent in its narrow reading is affected by any possibly disabling misconduct on Norton's part.)

The district court's conclusion that the '939 patent cannot reasonably be read as covering a bauxite mix was based on its consideration of the following items, all of which are part of the file wrapper: the claims of the patent, the specifications, the process claims (later abandoned) in the original application and a statement made by Norton to the patent examiner on April 2, 1962.

Claim 1 (the principal claim)[12] describes the invention in these terms:

"A fused abrasive material *consisting essentially of* a mixture of alpha-alumina and zirconia and containing less than 0.1% soda, said zirconia being present in an amount from 10 to 60% by weight of said mixture, said mixture consisting of portions (a) and (b), portion (a) of said abrasive material being an alumina-zirconia eutectic and portion (b) being crystals of a member selected from the group consisting of alpha-alumina and zirconia, said crystals having an average size not greater than 300 microns, said abrasive material having a high impact strength whereby it is suitable for snagging stainless steel." (emphasis supplied)

As the district court correctly noted, this claim certainly does not affirmatively suggest a bauxite mix. It is true that the language of claim 1, especially the phrase "consisting essentially of," does not negate the possibility of a bauxite mix being covered by the patent *if* other parts of the file wrapper sufficiently supported such a reading of the claim. The court found, however, that they did not, and we agree with that finding.

The specifications, after several general statements about the proposed invention and an enumeration of its purposes, make the following declarations relative to the raw mix:

"It has been found that these . . [purposes] may be attained by combining the desirable properties of fused alpha-alumina and zirconia. In this manner, an abrasive material is produced which combines the strength and hardness of alumina with the dur-

---

**10.** The court indicated the contingent nature of this aspect of its decision in these words: "I turn now to certain matters which lead to the conclusion that if, contrary to my interpretation, the patent should be construed as including a bauxite mix, such a claim cannot be enforced. . . ." 397 F.Supp. at 645.

**11.** There are many unresolved questions in the area of fraud and disabling misconduct in patent law. *See, e. g., Buzzelli v. Minnesota Mining & Mfg. Co.,* 521 F.2d 1162, 186 U.S.P.Q. 464 (6th Cir. 1975); *In re Multidistrict Litigation Involving Frost Patent,* 398 F.Supp. 1353,

185 U.S.P.Q. 729 (D.Del.1975). *See generally* Cullen & Vickers, Fraud in the Procurement of a Patent, 29 Geo.Wash.L.Rev. 110 (1960); Dodds, Fraud on the Patent Office, 56 J.Pat. Off. Soc'y 345 (1974). We think it best however, to express our views on these thorny questions only insofar as the facts of the case require us to do so. *See Alabama State Fed'n of Labor v. McAdory,* 325 U.S. 450, 461, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945).

**12.** The other claims of the '939 patent are not germane to this case.

ability and wear resistance of zirconia and it has been found that this abrasive is especially suitable for snagging operations.

"More particularly, it has been found that high purity alpha-alumina may be mixed with zirconia, also of high purity, in the proportions indicated hereinafter. . . .

"A study of fused combinations of alumina and zirconia revealed that those having between about 90% alumina-10% zirconia and 40% alumina-60% zirconia are products which can be crushed into grits with extremely high impact strength and which are particularly outstanding as a snagging abrasive. . . .

. . . . .

"Alpha-alumina which may be successfully utilized in the process of this invention is preferably of high purity, usually at least 99.8% by weight $Al_2 O_3$ and containing less than 0.1% sodium oxide. Another form of alumina which may be used is of a slightly lesser degree of purity and may contain up to as much as 0.4% sodium oxide."

The specifications continue on, more or less in the same vein, but nowhere do they indicate that the use of a bauxite mix is contemplated. They simply do not support in any way the broad reading of the '939 patent for which Norton contends.

The remaining contents of the file wrapper do not serve to buttress Norton's case. The process claims, which formed part of the original application but were subsequently withdrawn, no-

where indicate that bauxite might be used in the raw mix.[13]

■ With one exception, the file wrapper—the "written record of the preliminary negotiations between the applicant and the Patent Office for a patent monopoly contract," *D & H Electric Co. v. M. Stephens Mfg., Inc.,* 233 F.2d 879, 883 (9th Cir. 1956)—contains nothing which supports the broad reading of the '939 patent sought by Norton.[14] The only item in the file wrapper which provides a small amount of grist for Norton's mill is the following statement made by Norton's patent attorney to the Patent Office on April 2, 1962, in response to the patent examiner's initial rejection of October 6, 1961:

"The abrasive product produced by this invention is, chemically, $Al_2 O_3$ and $Zr O_2$ with minor amounts of impurities introduced with the source *(such as bauxite)* of alumina and the source of zirconia. . . ." (emphasis supplied)

The three words which we have italicized are those upon which Norton largely bases its case. But a brief remark which appears quite off-handed and which is virtually buried in the mountain of papers involved in this lengthy patent prosecution is simply not an adequate basis to legitimize a broad reading of the patent claim. The district court characterized this response as "oblique," "felt-slippered," and an "'unemphasized,' carefully measured maneuver." 396 F.Supp. at 646.[15] We agree that this parenthetical, apparently casual remark, "such as bauxite," is inadequate to support the broad reading of the patent which Norton now seeks.

---

**13.** We are aware that it is the product claim, not the process claim, that is at issue in this case. We resurrect the discarded process claim only to show that it offers no support, even tangentially, to Norton's argument in favor of a broad reading of the '939 patent.

**14.** "Claims of a patent must be interpreted with reference to the history contained on the file wrapper. . . ." *D & H Electric Co. v. M. Stephens Mfg., Inc., supra* at 882–83. *See also Decca Ltd. v. United States,* 420 F.2d 1010, 1013 (Ct.Cl.1970).

**15.** The district court not only examined the file wrapper in an attempt to arrive at a fair reading of the claim, but also considered in some detail in-house communications by Norton personnel concerning what tactics to use in the patent prosecution. We find it unnecessary to consider these documents since Norton's subjective intent is irrelevant to the scope issue. Whether by tactical choice or by inadvertence, Norton failed to state clearly that a bauxite mix was an essential part of its claim. It must now live with the consequences of that decision.

■■ It is a basic purpose of our constitutionally based patent system that a patent should clearly teach and meaningfully add to the fund of human knowledge.

> "The primary purpose of our patent system is not reward of the individual but the advancement of the arts and sciences. Its inducement is directed to disclosure of advances in knowledge which will be beneficial to society; it is not a certificate of merit, but an incentive to disclosure." *Sinclair & Carrol Co., Inc. v. Inter-chemical Corp.*, 325 U.S. 327, 330–31, 65 S.Ct. 1143, 1145, 89 L.Ed. 1644 (1945). (footnote omitted)

If this purpose is to be achieved, a patent must *teach*; it must make clear just what it embraces and what it does not embrace. "[T]he law requires such disclosure to be made in the application for patent that others skilled in the art may understand the invention and how to put it to use." *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 187, 77 L.Ed. 1114 (1933). *See also Graham v. John Deere Co.*, 383 U.S. 1, 5–10, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Claim 1 of the '939 patent falls far short of meeting this requirement; neither the claim itself nor the file wrapper indicates with sufficient clarity that a bauxite mix was contemplated. In the words of the district court, "[I]f Norton truly wished the world to be aware that it was claiming a bauxite mix, the place to say so was in the claims themselves, or at least in the specifications which, without it, pointed in the opposite direction, and not by a half-hidden implication, itself buried in an extended prosecution file." 397 F.Supp. at 646.

■ Norton argues strenuously on appeal that the reference in the specifications to a raw mix containing alumina was intended to be merely an *illustration* of the kind of raw mix which could be used to produce the product in question. Norton alleges that this "illustration"

was given to satisfy the requirements of the first paragraph of 35 U.S.C. § 112:

> "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

But this line of argument misses the mark. As the district court correctly noted, 397 F.Supp. at 642, the '939 patent as awarded dealt with a product claim, not a process claim; and we are not presently concerned with whether § 112 was satisfied. Norton's arguments for giving a broad scope to the '939 patent essentially amount to a claim that it includes a *product* with features which only a bauxite mix, and not an alumina mix, produces. Norton, however, is bound by the shortcomings of its own claims and the other statements it made to the Patent Office.

We therefore agree with the district court's narrow reading of the '939 patent according to which it "does not disclose, or purport to cover, a bauxite mix. . . ." 397 F.Supp. at 645. Accordingly, there is no necessity for us to consider whether Norton's alleged misconduct in not revealing the prior '491 patent to the examiner in the course of the '939 prosecution renders the latter patent invalid or unenforceable if construed as covering a bauxite mix. We need only ask whether that alleged misconduct should affect the '939 patent as narrowly construed.

■ The district court found that the non-disclosure of the '491 patent, which it considered to be "affirmatively deceptive,"[16] was nevertheless "not disabling vis-a-vis an alumina mix." 397 F.Supp. at 647.[17] While the court might

---

**16.** 397 F.Supp. at 646. The district court used this expression in the course of discussing whether the patent should be enforced if it were to be construed as including a bauxite mix.

**17.** Since the '491 patent does not deal with an alumina mix, its non-disclosure in the '939 prosecution could not have a per se disabling effect on the latter patent *(as narrowed)* under 35 U.S.C. § 102. It could have a disabling

properly have reacted in other ways to Norton's "affirmatively deceptive" behavior, we hold that it did not go beyond its discretion in its choice of remedies in this case. What might be disabling misconduct or even fraud viewed from the perspective of a broad reading is of less moment when viewed from the perspective of a less encompassing reading. The district court found that the second reading was the proper one and then found the non-disclosure not to be disabling as to that narrower reading. We do not find that, given its broad equitable discretion, the court failed properly to apply to this situation the equitable maxim that "he who comes into equity must come with clean hands." See *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814–15, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). The Supreme Court, in the context of patent law, has said of this maxim:

> "This maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant. It is 'not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.'" *Id.* at 815, 65 S.Ct. at 997, quoting *Keystone-Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245–46 (1933).

A court thus free to use its equitable powers to punish wrongful behavior, has equally wide discretion to withhold punishment of behavior which it considers not to warrant so severe a sanction. The Supreme Court remarked in *Precision Instrument* that "while 'equity does not demand that its suitors shall have led blameless lives,' . . . as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue." *Id.* at 814–15, 65 S.Ct. at 997, quoting *Loughran v. Loughran*, 292 U.S. 216, 229, 54 S.Ct. 684, 78 L.Ed. 1219 (1934). Once the narrow reading of the '939 patent is settled upon, it can be said to constitute "the controversy in issue" concerning which the district court could find that Norton "acted fairly and without fraud or deceit." *Cf. Wen Products, Inc. v. Portable Electric Tools, Inc.*, 367 F.2d 764, 767 (7th Cir. 1966).

As for the district court's finding that Carborundum's product Big Red infringed the '939 patent as narrowly construed, we perceive no clear error. *See Stilz v. United States*, 269 U.S. 144, 147–48, 46 S.Ct. 37, 70 L.Ed. 202 (1925); *McCullough Tool Co. v. Well Surveys, Inc.*, 343 F.2d 381, 401 (10th Cir. 1965), *cert. denied*, 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966). It is true that there is no evidence that Big Red is used for snagging steel, but the '939 patent covers a chemical mix which results in crystals of a particular type and quality whose utility is not limited to snagging steel.

■ Carborundum also contends that the '939 patent is invalid under 35 U.S.C. § 102[18] and/or 35 U.S.C. § 103.[19] Again, we need pass on this question only as it affects the patent *as narrowed*. Viewed in this light the patent is, as the district court found, valid and enforceable. The court found the high zirconia content[20] to be the principal aspect of the invention, 397 F.Supp. at 641, and held that it

---

effect only if it were to be considered inequitable behavior of such magnitude that the '939 patent should be declared unenforceable.

**18.** Specifically, it argues that the '939 patent, whether construed narrowly or broadly, was anticipated by the '490 and '491 patents.

In dealing with an alleged anticipation under § 102, it should be recalled that "[t]o anticipate under section 102, a prior art reference must disclose all the elements of the claimed invention or their equivalents in essentially the same way." *Shanklin Corp. v. Springfield Photo Mount Co.*, 521 F.2d 609, 616 (1st Cir. 1975).

**19.** Specifically, Carborundum argues that the '939 patent, whether construed narrowly or broadly, is invalid because its subject-matter would have been obvious to those skilled in the art at the time of the alleged invention.

**20.** Both parties define "high zirconia content" as meaning ten percent and over.

was neither precluded by the prior art nor obvious. 397 F.Supp. at 647.[21]

The '490 patent involved a product of low zirconia content with resultant characteristics different from those of high zirconia content products.[22] We do not find that it constituted prior art anticipating the invention for which the '939 patent was issued.

As for the '491 patent, we agree with the district court that it does not constitute prior art with respect to the '939 patent as narrowly construed.[23] The specifications of the '491 patent state, inter alia :

"Zirconia additions in amount as small as two to five per cent are sufficient to produce strongly marked effects of the character indicated above [viz. high strength product, etc.]. *Either smaller or larger proportions of zirconia may be used.*" (emphasis added)

Carborundum, understandably, cites the italicized words as indicating that the '491 patent embraces a product of high zirconia content. The district court, however, read the reference to "two to five per cent" as the optimum teaching and held that the "larger proportions may be used" clause was inserted as a protection against imitators who might not use the *exact* two to five per cent proportion and who might then claim that they had not infringed. 397 F.Supp. at 647. We agree with the court's assessment of both the '490 and the '491 patents and with its conclusions as to the prior art objections to the '939 patent.

As for obviousness, it is important to note that, relatively simple as the use of large amounts of zirconia might appear to a Monday morning quarterback, it simply had not been done before. *See Arnold Pipe Rentals Co. v. Engineering Enterprises, Inc.*, 350 F.2d 885, 890 (5th Cir. 1965). It is well settled that "the determinations underlying the question of obviousness are essentially factual ones primarily entrusted to the district courts," *Nashua Corp. v. RCA Corp.*, 431 F.2d 220, 222 (1st Cir. 1970), and we find no clear error in the court's determinations in this regard. *See Shanklin Corp. v. Springfield Photo Mount Co., supra* at 616.

In upholding the patent's validity, the district court also relied on findings of utility and of commercial success. In finding utility, although it observed that the invention was "hardly the achievement of the century," the court emphasized the usefulness of the high zirconia product in "snagging." 397 F.Supp. at 646–47. For this finding as for that of commercial success there was sufficient credible evidence, and the court's conclusions in these matters were not clearly erroneous.

The district court also gave some weight to the presumption of validity. 35 U.S.C. § 282. Carborundum objected in the district court to the application of the presumption in this case, and it renews its objection on this appeal. Carborundum bases its objection on Norton's alleged fraud in not revealing the '491 patent to the patent office during the prosecution of the '939 application.[24] Once the necessity of narrowly

---

**21.** In addition to finding inventiveness in the use of a high zirconia content, the district court also found that it was "somewhat inventive" to realize that a very low soda content (claim 1 specifies less than 0.1 percent) was necessary to furnish an abrasive sufficiently strong for "snagging" purposes. 397 F.Supp. at 641.

**22.** The district court credited the testimony of Norton's expert witness, Loring Coes, Jr. Coes testified that the teaching of the '490 patent would not lead one to think that the addition of zirconia to pure alumina would produce a snagging abrasive. Statement No. 2 of Loring Coes, Jr. *See* 397 F.Supp. at 647.

**23.** Since we have determined that the '939 patent should be construed as not including a bauxite mix, we do not have to inquire whether if construed more broadly it would have been anticipated by the '491 patent.

**24.** Carborundum also argues that the '491 patent represents prior art which was not before the Patent Office and that it therefore renders the presumption inoperative. *See Henry Mfg. Co., Inc. v. Commercial Filters Corp.*, 489 F.2d 1008, 1013 (7th Cir. 1972). We have already dealt with the prior art issue, *supra*, so we need now deal only with the effect of the alleged fraud on the presumption.

construing the '939 patent is conceded, however, the flaw in Carborundum's reasoning is apparent: the circumstances surrounding Norton's non-revelation of '491 would have to be considered if '939 were read as including a bauxite mix, but they are not material when '939's scope is narrowed. The scope of a patent defines not only its enforceability but also the limits of materiality of an allegation of fraud in the procurement of the patent. "[C]ourts of equity . . . apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245, 54 S.Ct. 146, 147, 78 L.Ed. 293 (1933); cf. *Edward Valves, Inc. v. Cameron Iron Works, Inc.*, 286 F.2d 933, 947, modified on other grounds, 289 F.2d 355 (5th Cir.), cert. denied, 368 U.S. 833, 82 S.Ct. 55, 7 L.Ed.2d 34 (1961). Accordingly, we find no error in the district court's reliance on the statutory presumption of validity.

■■■ Carborundum also claimed unsuccessfully in the district court that the '939 patent should be invalidated for its failure to name the proper inventor, in violation of 35 U.S.C. § 116. Simply stated, the problem is that the application for the '939 patent listed only Marshall and Roschuk (two Norton employees) as inventors and did not name Thibault (also a Norton employee) as an inventor although in 1951 he had written a letter proposing the production of an abrasive from a bauxite and zircon mix. We agree with the district court that Thibault's suggestion was insufficiently formalized at the time so as to constitute an invention. *See* 397 F.Supp. at 648.[25]

■■■ Carborundum's antitrust counterclaim under 15 U.S.C. §§ 2 and

15 was grounded on the theory that in not revealing the '491 patent to the Patent Office and in bringing an infringement action against Carborundum's bauxite mix product, Norton was guilty of seeking to monopolize in restraint of trade. The district court rested its rejection of the counterclaim on two grounds: (1) a finding that Carborundum had not "sustained its burden of proving Norton guilty of legally actionable fraud, as distinguished from mere disabling misconduct"; and (2) Carborundum's own conduct in an interference proceeding in which it argued that the '939 patent was valid and that it covered a bauxite mix. 397 F.Supp. at 648. Either of these grounds would suffice as a basis for ruling against the counterclaim, and the district court did not commit clear error in regard to either. The question of fraud is one of fact, *Edward Valves, Inc. v. Cameron Iron Works, Inc.*, supra at 947, to which the "clearly erroneous" standard of Fed.R.Civ.P. 52(a) applies, id. at 947–48. An allegation of fraud must be proved by clear, unequivocal and convincing evidence and not by a mere preponderance of the evidence which leaves the issue in doubt. *United States v. American Bell Telephone Co.*, 167 U.S. 224, 251, 17 S.Ct. 809, 42 L.Ed. 144 (1897); *Scott Paper Co. v. Fort Howard Paper Co.*, 432 F.2d 1198, 1204 (7th Cir. 1970), cert. denied, 401 U.S. 913, 91 S.Ct. 882, 27 L.Ed.2d 812 (1971); *Baldwin-Lima-Hamilton Corp. v. Tatnall Measuring Systems Co.*, 169 F.Supp. 1, 25 (E.D. Pa.1958), aff'd, 268 F.2d 395 (3d Cir.), cert. denied, 361 U.S. 894, 80 S.Ct. 190, 4 L.Ed.2d 151 (1959). The district court found that Carborundum failed to sustain its burden of proof, and that finding is not clearly erroneous. Although Norton was less than commendably straightforward, the record does not indicate that Norton's behavior constituted common law fraud on the Patent Office.[26]

25. The court also found that Thibault's contribution was adequate to warrant the allowance of Norton's motion to add Thibault as a co-inventor. 35 U.S.C. § 256. That finding was not clearly erroneous.

26. *See United States v. Cold Metal Process Co.*, 62 F.Supp. 127, 140 (N.D.Ohio 1945), aff'd, 164 F.2d 754 (6th Cir. 1947), cert. denied, 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948). *See generally Cullen & Vickers, supra* note 11.

We note that at least one commentator has criticized incorporating "in their pristine rigor the elements of common law deceit into actions predicated upon misrepresentations before the Patent Office,"[27] suggesting that easing the evidentiary burden of the party alleging misrepresentation would serve "to implement more effectively the public policy goals implicit in the patent and antitrust laws."[28] There is a certain attractiveness[29] in this suggestion, and we suspect that it may one day be generally adopted.[30] At present, however, the controlling cases do not go beyond fraud in the traditional sense.[31] *See, e. g., Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944); *see also Beckman Instruments, Inc. v. Chemtronics, Inc., supra* at 1380–81. In any event, Carborundum—as the district court noted—would seem particularly unfit to maintain such a private treble-damages action in the light of its own behavior during the interference proceedings. In those proceedings, in which one Cutts—a Carborundum employee—claimed prior invention, it was asserted that the '939 patent was valid and that it included a bauxite mix. Viewed in this light, it would not be equitable for Carborundum to be allowed to disavow its former assertions and to profit financially from the imposition of penalties on Norton for espousing the same construction of the patent as Carborundum formerly did.

■ Finally, Carborundum appeals from the denial of attorney fees. It contends that this is one of those "exceptional cases" to which 35 U.S.C. § 285 refers.[32] While there is precedent indicating that conduct short of fraud can make a case "exceptional" within the meaning of § 285, *see, e. g., L. F. Strassheim Co. v. Gold Medal Folding Furniture Co.*, 477 F.2d 818, 824 n. 9 (7th Cir. 1973); *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.*, 407 F.2d 288, 294 (9th Cir. 1969), this is a matter which is committed to the sound discretion of the district court and which an appellate court will not disturb absent a showing of an abuse of discretion. *Rockwell v. Midland-Ross Corp.*, 438 F.2d 645, 655 (7th Cir. 1971); *Specmade Products, Inc. v. J. A. Barnett*, 354 F.2d 229, 230 (5th Cir. 1966). Cf. *Dale Electronics, Inc. v. C. L. Electronics, Inc.*, 488 F.2d 382, 391 (1st Cir. 1973). We are not prepared to say—especially in the light of the position taken by Carborundum in the interference proceedings—that in denying attorney fees in this case the court abused its discretion.

27. Carney, Misrepresentations Before the Patent Office: Antitrust and Other Legal Effects, 12 B.C.Ind. & Com.L.Rev. 1005, 1006 (1971).

28. *Id.* at 1007.

29. Proceedings before the Patent Office are not adversarial in nature and applicants should make full and candid disclosure of all relevant information. *See Kingsland v. Dorsey*, 338 U.S. 318, 319, 70 S.Ct. 123, 94 L.Ed. 123 (1949); *Beckman Instruments, Inc. v. Chemtronics, Inc.*, 439 F.2d 1369, 1378–79 (5th Cir.), *cert. denied*, 400 U.S. 956, 91 S.Ct. 353, 27 L.Ed.2d 264 (1970); *Charles Pfizer & Co. v. F. T. C.*, 401 F.2d 574, 579 (6th Cir. 1968), *cert. denied*, 394 U.S. 920, 89 S.Ct. 1195, 22 L.Ed.2d 453 (1969); *Corning Glass Works v. Anchor Hocking Glass Corp.*, 253 F.Supp. 461, 470 (D.Del.1966), *modified on other grounds*, 374 F.2d 473 (3d Cir.), *cert. denied*, 389 U.S. 826, 88 S.Ct. 65, 19 L.Ed.2d 80 (1967).

30. Cf. *Pfizer, Inc. v. Int'l Rectifier Corp.*,186 U.S.P.Q. 511 (D.Minn.1975); *In re Multidistrict Litigation Involving Frost Patent, supra*. Both of these cases deal with unenforceability because of inequitable conduct rather than with antitrust penalties, but they by no means hold that the latter penalties would not be available in an appropriate case against a patent applicant who breached his fiduciary duty of absolute candor towards the patent office.

31. Norton's non-disclosure of the '491 patent does not constitute common law fraud because it is not material to the '939 patent *as narrowly construed*.

32. "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285.

**446**

Carborundum raises certain other objections to the validity of the '939 patent, alleging failure to comply with 35 U.S.C. § 102(f) and with 35 U.S.C. § 112. Our review of the record convinces us, however, that these objections are without merit.

*Affirmed.*