ST. REGIS PAPER COMPANY,
Plaintiff,

v.

WINCHESTER CARTON
CORPORATION,
Defendant.

Civ. A. No. 71–2052–F.

United States District Court,
D. Mass.

Feb. 18, 1976.

John N. Williams and Charles C. Winchester, Fish & Richardson, Boston, Mass., Cooper, Dunham, Clark, Griffin & Moran, by Raymond J. McElhannon and Norman H. Zivin, New York City, for plaintiff.

Thomson & Mrose, James E. Mrose, Boston, Mass., for defendant.

## OPINION

ALDRICH, Senior Circuit Judge.*

This is a suit by St. Regis Paper Co., owner of two patents, No. 3,001,684, Wenzel, Service Tray, September 26, 1961 (hereinafter W1) and No. 3,140,035, Wenzel, Service Tray, July 7, 1964 (hereinafter W2), against Winchester Carton Corp., alleging infringement. Defendant denies both infringement and validity. Both parties manufacture paperboard service trays used in the fast food industry, so-called, and have done so for over twenty years. One Wischusen, president and sole operator of Winchester, will be referred to, or included as, defendant where the personal intendment is apparent.

Plaintiff's W2 tray, patented as an improvement over W1, and demonstrating the features of both, is illustrated and

* Sitting by designation.

described as follows, the illustrations being Figures 1 and 2 of the patent, the definitions, in some instances, being the court's.

July 7, 1964      F. A. WENZEL      3,140,035

SERVICE TRAY

Filed April 1, 1963      2 Sheets—Sheet 1

*Tray.*—Here used to denote a die-cut, disposable, paperboard two-level service tray, bought and stored as a "flat," doubled over once with the ends flap-glued together, easily transposed into a rectangular center box food compartment (11), with, at each end, a raised platform, or top (10), having circular cut-outs (16, 17) to contain cups for drink or food.[1]

*Transverse flap,* or partition (18, 19)— An inner side of the center box, made by bending down an extension of the cup platform. The flap has a center *slit,* sometimes described in the patent as a slot.

*Cup stay,* or strut (25, 26)—A middle partition underneath the cup platform at right angles to the transverse flap, made from the cup cut-out, with one end permanently "adhered" to the tray bottom.

*Shoulder* (32, 33)—The sloping edge of a cup stay nearest the center box, which

1. There are also "half-trays," but these present no separate question.

extends through the slit in the transverse flap on erection (34).

*Rim* (37)—A horizontal ledge on an outer side of the center box, made by bending inwardly the top of the side (14, 15).

Erection is accomplished by the server, who erects the tray from the flat when filling the order, (1) pressing the side edges of the flat horizontally towards each other, causing the platform to rise by pivoting on the outer sides and the cup stays until said members, which have partially cut-through score lines to facilitate bonding (27, 28), are at right angles to the bottom and to the platform, and (2) bending downwards the transverse flaps, also scored (23, 24), until the slit straddles the cup stay shoulder (34), effecting a friction lock.

W1 differs in that the cup stay is an extension of the bottom sheet, bent upwards and adhered to the top. The transverse flaps extend to, and support, the outer sides, which can have no center box rim because this requires material deducted from the flaps.

The W2 claims and specifications state that the transverse flap "may" be bent more than 90%, resulting in the center box being wider at the bottom than the top. In point of fact, "may" means "must," since if the cup cut-out serves as the stay, the transverse flap could not intersect it unless bent beyond 90°. It is asserted in the patent that the additional bending, resulting in the center box being wider at the bottom than at the top, and making the platform an overhanging ledge, is an advantage. I find none.

A one-time-use erectable tray must have a number of characteristics: cheapness of manufacture; simplicity and speed of erection, and strength. (1) Cheapness is best achieved by restricting the material to a single sheet of paperboard, with minimum gluing. (2) Speed of erection is, essentially, a by-product of simplicity. (3) Strength, because an erectable tray is, correspondingly, collapsible, means not only with relation to the contents, but also resistance to collapse. It is the successful achievement of all factors that poses the difficulty.

Because erectable trays and containers have long been in the art, I detail plaintiff's features before considering to what extent they are novel or inventive. (1) Both W1 and W2 are made inexpensively, W2 requiring the minimum amount of material because using the cup cutouts as stays avoids W1's adding to the length of the basic sheet. (2) Both W1 and W2 erect easily; W2 slightly more so because the transverse flaps do not tough the outer sides. The common center friction shoulder lock is of great erectable simplicity. (3) The matter of strength calls for more discussion. Trays undergo stress from handling and from the weight of the contents. Defendant offered as exhibit D1 a tray it allegedly made in the mid-fifties, well prior to the patent. D1 is like W1, except that it lacks the center lock. The transverse flaps butt against the outer sides, and effectively prevent collapse as long as the flaps remain rigid. Thin paperboard, however, bends. Weight in the tray, including cups of heavy liquid, which rest on the bottom since they are supported only laterally by the platform, makes the bottom sag, effecting a constructing force on the sides. So, also, may handling. This pressure may cause the flaps to buckle, in turn reducing butt resistance, and there is a danger of partial collapse. W1's center lock at least doubles the rigidity of the flap, and hence resistance to buckling.

In sum, I find plaintiff's center friction lock tray achieved maximum strength even though, if properly erected, defendant's D1 transverse flap may receive some support from the butt of the cup stay. In fact, the center lock, as proven by W2's great commercial success, was so efficient that it permitted eliminating all contact between the butts of the transverse flaps with the outer sides, thereby somewhat facilitating erection, and releasing material for the center box rims. I find, also, that each rim provided a beneficial amount of lateral support.

While these matters are fresh, I turn to defendant's accused trays. Defendant has some of the features of each patent. It has W2's cup stay made from a cup cut-out. On one outer side it does not carry the transverse flap all the way, and hence is able to have a rim. On the other side it butts the flap against the outer side. There was, however, a substantial controversy whether defendant adopted plaintiff's cup stay lock. Concededly, its early accused trays precisely did. Upon learning that he was charged with infringement, defendant, who his counsel says would rather switch than fight, changed from a slit to a truncated triangular slot, one side remaining erect and pressing against the side of the shoulder as before, but the other side sloping away so as to avoid contact. Whether these structures infringed either patent I defer until after considering validity.

■ I do not believe it necessary to describe in detail the many prior patents introduced by defendant. I do reject out of hand plaintiff's contention that "a single prior art reference [must] disclose all of the claim elements or their substantial equivalents."[2] On the contrary, I rule, to follow the court's opinion in *Associated Folding Box Co. v. Levkoff*, 1 Cir., 1952, 194 F.2d 252, at 257, that it is not enough "to integrate the old elements in a single structure." It must be found that the "new and useful . . . tray . . . was an unusual or surprising consequence of the unification of the old elements." Even on that basis, however, I find that the defense of invalidity has not been sustained.

There was nothing novel about W1's erected shape, as is demonstrated by Anderson, Roadside Stand Tray, Patent No. 2,732,994, Jan. 31, 1956, but the difficulty of Anderson's assembly, not to mention

original cost, shows fully why it apparently never gained acceptance. Other trays, such as Foster, Drive-in Theatre Service Tray, Patent No. 2,640,589, June 2, 1953, were not only complex to set up, but could come apart on use. I do not find in this field, or in any analogous art, the simple locking mechanism that made plaintiff's trays a success.[3] The "slots made by the cuts" in Anderson did not erect or function at all in the same way. Nor do I find that Buchmiller & Cohen's Paperboard Serving Tray, Patent No. 2,670,124, Feb. 23, 1954 flap lock teaches plaintiff's. I have no difficulty in finding that W1 was a markedly useful, but unobvious, advance over all cited prior art, viewed separately or collectively, that, although W2 was better, achieved a markedly successful combination of all three factors listed at the beginning of this opinion.

I deal now with the D1 and D7 trays defendant allegedly made and marketed sufficiently before W1 and W2, respectively. For the dates there is nothing but defendant's word. He is not corroborated by invoices, because such invoices as were produced do not, without his word, identify the trays. I find defendant's conduct somewhat singular. When, in June, 1969, plaintiff by registered letter notified defendant of infringement, it was, assertedly of W2. If defendant had sold D7 trays when, later, he said he did, they contained every feature claimed as making W2 inventive. However, defendant made no reply to plaintiff's letter. Plaintiff wrote again in December, 1970. This letter was shortly acknowledged by counsel, but a substantive reply was not made until May, 1971. Even then counsel's letter was largely directed to non-infringement, with no direct assertion that defendant had anticipated the patent.

---

2. This may well be so as to anticipation, but it is not as to obviousness.

3. Defendant's playing down the significance of W1's friction lock was carried to the point of evasion. On being asked whether his D1 tray lacked strength because of not having it, he replied, "Oh, Lord no." Conversely, when shown his brochure, issued after he had slavishly copied the lock, and reciting the tray's "rigid center struts that snap into position with little effort by server," he sought to dismiss this as an advertising ploy. I find both protests consciously incorrect.

■ Defendant was not an impressive witness. I have commented elsewhere, although not fully, on his evasiveness. Whatever may be the burden on a defendant to overcome the presumption of validity by prior cited art, on which the cases express widely divergent views, when a defense depends upon oral testimony it must be clear and convincing. *See* discussion in *Dickstein v. Seventy Corp.*, 6 Cir., 1975, 522 F.2d 1294, 1296, cert. denied (1/12/76), 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 644; *Campbell v. Spectrum Automation Co.*, 6 Cir., 1975, 513 F.2d 932, 936–37; *Universal Inc. v. Kay Mfg. Corp.*, 4 Cir., 1962, 301 F.2d 140, 148. I do not so find it here.

I may add that, for reasons already stated, W1 would not have been anticipated by a D1 structure in any event because of the absence of the center lock, and the absence of anything else that adequately approximated its function.

On the other hand, I find W2 invalid, even without D7. The claimed feature of utilizing the cup cut-out as the cup stay is to be found in Spillson, Carry Out Tray, Patent No. 3,149,770, issued Sept. 22, 1964, but applied for early enough to cite against W2. Plaintiff gains nothing but censure for seeking to distinguish Spillson as "stopp[ing] short of providing interlocks between his cutout stays and his transverse flaps." Of course he did, or he would have infringed W1.[4] On the other hand, defendant gains nothing by citing Coe, Carrying Tray, Patent No. 3,005,584, Oct. 24, 1961. I do not find Coe taught W2's rim. However, the principal feature of W2, and the only valuable feature of claim 1, was the saving of material effected by the cup cut-out stay. Claim 2's rim, which the applicant in effect stated was dependent, did not save the patent, and would have been insufficiently inventive in itself under any circumstances. The discovery that the center lock had unexpected

strength (thereby releasing material for the rim), is not invention. *General Elec. Co. v. Jewel Incandescent Lamp Co.*, 1945, 326 U.S. 242, 249, 66 S.Ct. 81, 90 L.Ed. 43.

■ Defendant's pre-1972 trays which precisely followed W1's center friction lock plainly infringed that patent. It is no defense that defendant's transverse flap butted on only one side; defendant still followed the basic invention. And, even if defendant's use of the cup cut-out for the stay, and its addition of the rim, is sufficiently improving as to be inventive, an improver patentee acquires no rights in the basic patent. *Temco Elec. Motor Co. v. Apco Mfg. Co.*, 1928, 275 U.S. 319, 328, 48 S.Ct. 170, 72 L.Ed. 298. As against W1, I find that defendant's cup stay was an equivalent. When erected it was in exactly the same place, served the same purpose, and achieved the same result. So far as the basic concept is concerned, it makes no difference what part of the sheet the material comes from. As defendant's brief said in discussing Anderson as prior art, "no inventive distinction" is involved as between a top and a bottom, or from what portion the cup stays are struck. It was not for these reasons that Anderson is unimpressive. Likewise, it is unimportant that defendant's later cup stay is an aggregation of two pieces. *See, e. g., Duo-Flex Corp. v. Building Service Co.*, 5 Cir., 1963, 322 F.2d 94, 99. The concept was preserved.

The only matter deserving attention is the difference in defendant's truncated slot, which removed flap contact from one side of the cup stay. I quite agree with the concession in defendant's brief that this was a "fruitless change . . . to avoid suit." The basic idea of supplying frictional butt support at the central portion of the transverse flap remained; all that defendant accomplished was a partial loss of efficiency. This was not a

---

4. However, I do not fault plaintiff for originally making claim under W2. Spillson, not issued until after W2, was apparently never manufactured, and, presumably, did not come to plaintiff's attention until this litigation was under way. And had W2 been valid, at least claim 1 was infringed, under the same reasoning I have applied with respect to W1.

case of doing something less (it was at least as much, if not more of an operation to cut and dispose of a slot rather than simply make a slit) or something materially different, to achieve the same result, but a classic example of getting something less, but still acting within the concept of the invention. *Lawrence Rigging, Inc. v. Airtek Corp.*, D.Mass., 1974, 182 U.S.P.Q. 375, 378; *Admiral Corp. v. Zenith Radio Corp.*, 10 Cir., 1961, 296 F.2d 708, 717; *Esco Corp. v. Tru-Rol Co.*, D.Md., 1972, 352 F.Supp. 416, 426, *aff'd mem. on opinion below*, 4 Cir., 1974, 489 F.2d 699. Defendant's contention that plaintiff is estopped by matters found in the file wrapper reads altogether too much into the file wrapper. I would reject defendant's interpretation even on the assumption that plaintiff's burden of proving equivalency includes disproving estoppel.

Finally, I deal with defendant's novel contention that its center lock construction is to be excused because defendant fell into it by reason of circumstances, instead of by an attempt to copy the patent. The narrow size of defendant's cutting machine allegedly required the cup cut-out, when used as a stay, to project into the path of the descending transverse flap. According to defendant, an expensive operation would have been needed to remove the projecting shoulder. Hence it was production exigencies that resulted in the shoulder's interference with the transverse flap. Even at its face value this does not explain why, if defendant wanted to avoid using W1's shoulder lock, it could not have made an isoceles triangular, instead of a truncated triangular, slot in the flap, and avoided all shoulder contact. I find that instead of being forced into it, defendant both desired and needed the shoulder support. Furthermore, even if defendant's factual explanation were made out, it would not be a legal defense. Infringement is determined by result. Defendant's cases involving non-infringement when a literal infringement is excused because it serves a different purpose, relate to a different op-

erative purpose, not to a purpose related simply to the mechanics of production. This excuse is frivolity itself, factually and legally.

Plaintiff asks for treble damages and attorney's fees. 35 U.S.C. §§ 284, 285. I find that defendant was aware of plaintiff's trays, and of the patents, from the time it started infringing W1. The claim that W1 is invalid is quite unpersuasive, and this failing was accentuated by defendant's conduct, both prior to trial and during trial. The same is to be said as to infringement. Defendant adopted W1's lock shortly after its appearance; made a mere show of abandoning it after formal notice, and offered a frivolous explanation at trial. This is an appropriate case to award double damages. If defendant were the giant and plaintiff the small independent, I would make it treble, and if the Court of Appeals should think my distinction inappropriate, then the award should be treble rather than single.

Attorney's fees is another matter. Plaintiff lost with respect to W2, which will have an ultimate effect on the expiration of its monopoly. However, I allow full costs apart from counsel fees.

